UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

AP, by his parents and legal guardians Dave
and Julia Peterson,

Case No. 06-CV-2342 (PJS/RLE)

Plaintiff,

v.

ORDER

ANOKA-HENNEPIN INDEPENDENT
SCHOOL DISTRICT NO. 11,

Defendant.

---

Justin M. Page and Barnett Rosenfield, MINNESOTA DISABILITY LAW CENTER, for
plaintiff.

Lawrence J. Hayes, Jr. and Stephen M. Knutson, KNUTSON, FLYNN & DEANS, P.A.,
for defendant.

The parents of plaintiff AP, a diabetic boy, sought to enroll him in a day-care program
called "Adventures Plus" operated by defendant Anoka-Hennepin Independent School District
No. 11 ("District 11"). AP's parents asked District 11 for various accommodations related to
AP's diabetes. AP's parents were dissatisfied with District 11's response and, consequently, AP
never attended Adventures Plus. AP contends that District 11 discriminated against him based
on his disability by refusing to grant the requested accommodations, and AP now seeks
compensatory damages for that refusal. AP brings claims under Title II of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12132, the Rehabilitation Act, 29 U.S.C. § 794 (known as
"§ 504" of the Act), and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.12
subd. 1.

- 1 -

District 11 moves for summary judgment on all of AP's claims. For the reasons described below, the Court denies District 11's motion in all respects, except insofar as it relates to AP's claim that District 11 acted unlawfully in refusing to train and authorize Adventures Plus personnel to provide glucagon injections. That claim is dismissed with prejudice.

## I. BACKGROUND[1]

AP was diagnosed with Type I diabetes in March 2002, when he was three years old. Hayes Aff. (First) Ex. 2 ("JP Dep.") at 10-12 [Docket No. 48]; Hayes Aff. (First) Ex. 6 at 1. Those who suffer from Type I diabetes require a regular external supply of insulin, a hormone that the body needs to process glucose (i.e., sugar).[2] Insulin reduces blood-sugar levels by enabling the body to remove glucose from the blood for use or for storage in the liver as glycogen.

Too much insulin, or not enough sugar intake, leads to hypoglycemia (i.e., low blood sugar). Severe hypoglycemia can be very dangerous and can require an emergency injection of glucagon. Glucagon is a hormone that, when injected, raises blood sugar by, among other things, causing the liver to convert stored glycogen into glucose that is released into the

---

[1]Because District 11 moves for summary judgment, the Court recounts the facts in the light most favorable to AP (to the extent that admissible evidence supports AP's version of the facts).

[2]The general information about Type I diabetes in this section is based on material from the National Library of Medicine and the American Diabetes Association. *See* U.S. Nat'l Library of Medicine & NIH, Medline Plus — Medical Encyclopedia, "Type I diabetes," http://www.nlm.nih.gov/medlineplus/ency/article/000305.htm (last visited Feb. 26, 2008; archived at http://www.webcitation.org/5VtpPpYHO); Am. Diabetes Ass'n, *Type I Diabetes*, http://www.diabetes.org/type-1-diabetes.jsp (last visited Feb. 26, 2008; archived at http://www.webcitation.org/5Vtp8fg6B).

bloodstream.[3]  Too little insulin, or too much sugar intake, leads to hyperglycemia (i.e., high blood sugar).  Severe hyperglycemia can lead to a dangerous condition called ketoacidosis.  Moderate hyperglycemia is not dangerous in the short term but can have serious long-term consequences if it occurs regularly.  Type I diabetics must regularly monitor their blood-glucose levels to calibrate how much insulin to take and to ensure that their blood sugar gets neither too low nor too high.

When AP was three and four years old, his parents administered insulin to him by way of injections.  JP Dep. at 13.  But in early 2005, after his fifth birthday, AP was fitted with an insulin pump.  *Id.*  An insulin pump is attached to a needle that remains constantly inserted in the patient (the needle is periodically moved to different locations).[4]  *See id.* at 14.  The pump is an electronic device worn by the patient that can be programmed to dispense finely calibrated doses of insulin on a regular schedule as well as on demand (generally before and after eating).  To calculate the appropriate dose of insulin, a patient checks his blood sugar by pricking his finger, placing a drop of blood on a test strip, and inserting the strip into an electronic blood-glucose meter.  Based on the patient's blood-sugar level and his anticipated sugar intake, the patient programs the pump to dispense a dose or "bolus" of insulin.

---

[3]*See* Medicinenet.com, *Glucagon*, http://www.medicinenet.com/glucagon/article.htm (last visited Feb. 26, 2008; archived at http://www.webcitation.org/5VtwVqAqx).

[4]Information in this paragraph about insulin pumps and blood-glucose meters is based on material from the American Diabetes Association.  *See* Am. Diabetes Ass'n, *Insulin Pumps*, http://www.diabetes.org/type-1-diabetes/insulin-pumps.jsp (last visited Feb. 26, 2008; archived at http://www.webcitation.org/5Vtp4wXow); Am. Diabetes Ass'n, *Checking Your Blood Glucose*, http://www.diabetes.org/type-1-diabetes/blood-glucose-checks.jsp (last visited Feb. 26, 2008; archived at http://www.webcitation.org/5Vtp21Rge).

In the spring of 2005, AP's parents sought to enroll him for the coming summer in Adventures Plus, a day-care program operated by District 11. Page Aff. Ex. 3 ("JP Aff.") ¶ 8 [Docket No. 54]; JP Dep. at 49-51. AP's mother, JP, contacted Adventures Plus about enrolling AP and met with Chris Orr, who was then the special-needs coordinator for Adventures Plus. JP Dep. at 49-51. JP told Adventures Plus staff that because of AP's diabetes, the program's staff would need to be trained to check his blood sugar with the blood-glucose meter, to work his insulin pump, and to administer injections of glucagon to AP if he suffered severe hypoglycemia. JP Aff. ¶ 8; JP Dep. at 50-51.

Adventures Plus refused to grant the requested accommodations. JP Aff. ¶¶ 9-10; JP Dep. at 52-53. AP's parents therefore did not enroll him in the program in the summer of 2005. Instead, they enrolled him in a private day-care center that agreed to provide the requested accommodations (as did day-care centers AP attended both before and after the summer of 2005). JP Dep. at 17, 20-23, 26-27, 52; JP Aff. ¶¶ 5-6, 31. AP's parents also engaged their current counsel and contacted a school-board member about District 11's refusal to grant their requested accommodations. JP Aff. ¶ 14; JP Dep. 46-49, 70-72.

For the 2005 school year, AP's parents planned to enroll AP in Adventures Plus for before- and after-school care and, during the school day, in a District 11-operated school called the Peter Enich Kindergarten Center. JP Dep. at 41-42. As the start of the school year approached, AP's parents continued to communicate with District 11 about how it would accommodate AP in both Peter Enich and Adventures Plus. In early August, a paralegal working with AP's current counsel wrote to District 11 on behalf of AP and his parents and asked the

district to put into writing exactly what it would and would not do to accommodate AP's

diabetes. Hayes Aff. (Second) Ex. B [Docket No. 59].

In response, Susan Butler, District 11's Director of Special Education, wrote a letter on

August 18, 2005 setting forth the district's proposed accommodations with respect to both Peter

Enich and Adventures Plus. Hayes Aff. (First) Ex. 13;[5] Hayes Aff. (First) Ex. 14 ("Butler Dep.")

at 11-12. Butler did not actually have supervisory authority over the Adventures Plus program,

and she did not speak directly with the people who did. Butler Dep. at 7-9, 12-13. In

formulating the Adventures Plus accommodations, Butler relied on the advice of Cindy Hiltz,

District 11's Health Services Coordinator. Butler Dep. at at 12-13. Hiltz, like Butler, had no

supervisory authority over Adventures Plus, but Hiltz consulted with Adventures Plus about

medical issues. Hayes Aff. (First) Ex. 12 ("Hiltz Dep.") at 9.

With respect to Adventures Plus, Butler wrote in her August 18 letter that program staff

would not administer glucagon, Hayes Aff. (First) Ex. 13 at 2, but Butler was not clear about

exactly what program staff would do with respect to AP's blood-glucose meter and his insulin

pump. Butler wrote that Adventures Plus staff would "[r]eceive and maintain the private

medical provider orders regarding monitoring the insulin pump and [AP]'s blood[-glucose]

level." *Id.*[6] Butler also wrote that staff would receive training from someone designated by AP's

---

[5]The Court notes that District 11 appears to have redacted this letter in ways that cannot
be justified. Because the letter was originally sent by District 11 to a paralegal working with
AP's counsel, no aspect of the letter can possibly be privileged. Perhaps the oddest redaction is
the name of the letter's author, Susan Butler. The Court does not understand why District 11
thought it was entitled to withhold Butler's identity.

[6]A form completed by AP's diabetes clinic dated July 27, 2005 indicated, with respect to
blood-glucose testing, that AP had "[p]ermission to test independently (classroom)," but also that
he would require "[s]upervision of testing/results" and "assistance with testing and blood glucose

parents and would "[m]onitor [AP]'s blood[-glucose] levels" in accordance with that training. *Id.* According to Butler, this language meant that staff would supervise AP's use of his blood-glucose meter and his insulin pump but would not operate either apparatus. Butler Dep. at 13-15. Hiltz likewise testified that the "monitoring" promised in the letter was supervision of AP rather than operation by staff of his insulin pump or blood-glucose meter. Hiltz Dep. at 31.[7]

In late August or early September, about a week before school was scheduled to begin, AP's parents met with personnel from District 11, Peter Enich, and Adventures Plus, including Hiltz and Tiffany Weeks, who had replaced Orr in July 2005 as the special-needs coordinator at Adventures Plus. JP Aff. ¶ 17; Hayes Aff. Ex. 10 ("Weeks Dep.") at 48-49; Hiltz Dep. at 27; Hayes Aff. Ex. 7 ("DP Dep.") at 17. AP's parents discussed with Hiltz and Weeks what

_____

management." Hayes Aff. Ex. 17.

[7]At Hiltz's deposition, Hiltz and AP's counsel had the following exchange about the meaning of "monitoring" in Butler's August 18 letter:

Q:      Do you know what was meant by monitoring?

A:      . . . I would read that to mean that staff would know how to look at the [insulin] pump and know what it was saying, remind [AP] to do pieces with the pump as needed. And the same with the blood level.

Q:      You mean remind [AP] to check his blood level?

A:      . . . [Y]es.

Hiltz Dep. at 31. Hiltz provided contradictory testimony about whether Adventures Plus staff agreed to operate AP's blood-glucose meter and his insulin pump, and about whether she attended a training session given by JP to Adventures Plus staff. *See* Hiltz Dep. at 26-29 (testifying that she attended a planning meeting before school with AP's parents and that JP "came back at another time" to train Adventures Plus staff); *id.* at 32-33 (testifying about JP's training session and implying that she was *not* present at that session); *id.* at 42-43 (testifying that she "was present when [JP] instructed Adventures Plus on how to do the accommodations" and that she believed that Adventures Plus staff were willing to operate AP's blood-glucose meter and his insulin pump).

accommodations AP would receive at Adventures Plus and offered to sign a liability waiver with respect to glucagon injections.  DP Dep. at 44.  Weeks and Hiltz told AP's parents that Adventures Plus staff would not administer glucagon to AP and would not operate his blood-glucose meter or his insulin pump.  JP Aff. ¶ 17; DP Dep. at 16-17; JP Dep. at 135-36.[8]

Soon thereafter, AP's parents canceled his enrollment in Adventures Plus.  Hayes Aff. (Second) Ex. D.  AP did, however, attend kindergarten at Peter Enich for the entire 2005 – 2006 school year.  AP brings no claims against District 11 with respect to his enrollment at Peter Enich.[9]

In mid-September 2005, AP's parents prepared a one-page memo titled "What we want from Adventures Plus program" and provided it to their counsel.  Hayes Aff. (Second) Ex. C; JP Dep. at 108-09.  JP testified that she believed that her counsel then forwarded the memo to District 11, *see* JP Dep. at 109, but no evidence in the record supports her belief.  That said, the memo nonetheless provides indirect evidence of what AP's parents asked of District 11 and what District 11 agreed to provide.  (The fact that an accommodation is listed in the memo increases the likelihood — but does not make it certain — that, before the memo was written, AP's parents asked for the accommodation and District 11 refused to provide it.)

---

[8]Weeks testified at her deposition that AP's parents did not ask that Adventures Plus staff be trained to operate AP's blood-glucose meter or insulin pump.  Weeks Dep. at 60-62, 74-75, 77.  But AP's parents have provided evidence to the contrary, and the Court must therefore credit their version of events in ruling on District 11's summary-judgment motion.

[9]AP's original complaint in this action raised claims based on District 11's alleged failure to accommodate AP's diabetes at Peter Enich.  Compl. ¶¶ 17, 22, 27 [Docket No. 1].  But AP dropped all such claims in his amended complaint.  *See* Am. Compl. [Docket No. 28].  Inexplicably, though, several pages of District 11's summary-judgment brief are directed at defeating claims related to Peter Enich — claims that are no longer in this case.  *See* Def. Mem. Supp. Mot. S.J. at 23-27 [Docket No. 48].

With respect to blood-glucose testing, the memo says that although AP "is able to check his own blood sugar most of the time," AP's parents "want 2-3 people trained on how to check his blood sugar and . . . able to check it" in case AP experiences hypoglycemia and does not feel well enough to do it himself.  Hayes Aff. (Second) Ex. C.  The memo likewise says that AP can generally work his insulin pump but that his parents "want Adventures Plus to be able to give [AP] insulin through his pump . . . . If needed they will be able to call us at any time to help walk them through the steps of giving insulin."  *Id.*  And the memo reiterates AP's parents' request that Adventures Plus staff be trained and willing to administer glucagon in the event of a hypoglycemic emergency.  *Id.*

In early November 2005, AP's counsel, Justin Page, put the three requested accommodations in writing.  In a letter protesting District 11's refusal to provide the accommodations requested by AP's parents in the Adventures Plus program and during school field trips, Page described the requested accommodations as follows:

> The accommodations that [AP] requires are assistance with checking his blood sugar level, staff members who will administer insulin to him through his pump, and in the case of an emergency, he will need staff members to be trained to administer glucagon to him. . . .

> [AP's parents] request the Anoka-Hennepin School District [to] assist [AP] on field trips and at Adventures Plus by checking his blood sugar, administering his insulin, and in the case of an emergency, administering his glucagon.

Page Aff. Ex. 4 at 1-2.

Around the time that Page wrote this letter, District 11 told AP's parents that the district would have to initiate formal administrative proceedings to determine, under Rehabilitation Act § 504, what accommodations District 11 would provide to AP in Peter Enich and Adventures

Plus.  JP Aff. ¶ 21; Hayes Aff. Ex. 8 ("Haley Dep.") at 18-20.  Up to that point, District 11 had

been providing services to AP at Peter Enich under what the district termed an "individualized

health plan."  District 11 develops such plans outside of its § 504 process — and for diabetic

students, the district usually prepares *only* an individualized health plan (and not a § 504 plan).

Haley Dep. at 56-57; Hayes Aff. Ex. 9 ("Nikolic Dep.") at 46.

Several months later, on March 1, 2006, District 11 staff met with AP's parents to discuss

the district's proposed accommodations.  JP Aff. ¶¶ 22-23.  Attending the meeting for District 11

were Hiltz, Weeks, and Danyelle Haley, a social worker at Peter Enich and the school's § 504

coordinator.  *Id.* ¶ 22.  They presented AP's parents with two accommodation plans, one for

Peter Enich (labeled a § 504 plan) and one for Adventures Plus (labeled an "inclusion plan").[10]

*See* Hayes Aff. Ex. 5 (§ 504 plan), Ex. 6 (inclusion plan).  Haley prepared the Peter Enich § 504

plan in consultation with the school nurse, Beth Nikolic, who in turn consulted with Hiltz.  Haley

Dep. at 21-22; Nikolic Dep. at 54-55, 61.  Weeks drafted the Adventures Plus inclusion plan,

also with input from Hiltz.  Weeks Dep. at 105-07.

The Adventures Plus inclusion plan did not provide that program staff would be trained

to operate AP's insulin pump or his blood-glucose meter.  *See* Haley Aff. Ex. 6.  With respect to

the insulin pump, notwithstanding the unambiguous request in Page's November 2005 letter that

Adventures Plus provide "staff members who will administer insulin to [AP] through his pump,"

Page Aff. Ex. 4 at 1, Weeks and Hiltz both said that they did not think that AP's parents

---

[10]The only § 504 plan for Peter Enich in the record is dated March 16, 2006.  Hayes Aff.
Ex. 5.  It appears likely that a draft of this plan was provided at the March 1 meeting, but this is
not entirely clear from the record.  It makes no difference to the Court's decision, because AP is
challenging only District 11's actions with respect to Adventures Plus.

requested such an accommodation before the March 1, 2006 meeting.  Hiltz Dep. at 55-56;

Weeks Dep. at 98.  Nikolic, however, did recall such a request.  Nikolic Dep. at 31.  But the

Adventures Plus inclusion plan provided only that staff would supervise AP's use of his insulin

pump and, if AP experienced severe hypoglycemia, staff would stop the flow of insulin from the

pump by kinking the tube that runs between the pump and the needle.  Hayes Aff. Ex. 6 ¶¶ 1, 3-

4, 7.  Kinking the tube would be unnecessary if staff knew how to operate the pump, since the

pump can be programmed to entirely suspend the delivery of insulin.  DP Dep. at 42.  AP's

parents strongly objected to this particular aspect of the plan, arguing that kinking the tube is

unsafe because it might not fully stop the flow of insulin.   *Id.* at 42-43. AP's parents also

argued that a layperson can easily be trained to suspend insulin flow by means of the pump's

menus.  *Id.*

        At some point after the meeting, District 11 revised the Adventures Plus inclusion plan to

provide that, rather than kinking the pump's tube if AP had severe hypoglycemia, staff at

Adventures Plus would disconnect the tube from the pump.  Hayes Aff. Ex. 11 at ¶ 7.  It is not

entirely clear when this revised inclusion plan was provided to AP's parents, but they do not

deny having received it.[11]

---

[11]It seems likely that the revised Adventures Plus inclusion plan was attached to the § 504 plan for Peter Enich dated March 16, 2006.  *See* Hayes Aff. Ex. 5 (under "Accommodation #3," referring to "attached Adventures Plus Child Inclusion Plan dated 3/1/06," but not including any attached inclusion plan).  But because the revised Adventures Plus inclusion plan bore the same date (March 1) as the original plan, it is hard to be sure.  Nothing turns on this, as there is no dispute that AP's parents received both plans and that neither plan provided the three accommodations at issue in this suit (i.e., agreement that Adventures Plus staff would operate AP's blood-glucose meter, operate his insulin pump, and deliver injections of glucagon in the event of dangerous hypoglycemia).

AP's parents made clear at the March 1 meeting that they were not satisfied with the proposed Adventures Plus inclusion plan. JP Aff. ¶¶ 22-23. After the meeting, JP expressed her dissatisfaction to Haley (the § 504 coordinator at Peter Enich), and Haley told JP to provide District 11 with a note from AP's doctor specifying what accommodations AP needed. *Id.* ¶ 24. According to AP's parents, Haley promised that District 11 would provide whatever accommodations AP's doctor specified. *Id.*; DP Dep. at 28.

In late March, JP forwarded a letter from AP's doctor, Constantinos Voulgaropolous, M.D., to District 11 and instructed the district to add the accommodations indicated in the doctor's letter to the Adventures Plus inclusion plan. JP Aff. ¶ 25; Page Aff. Ex. 5. Voulgaropolous said that in case of a severe hypoglycemic emergency, AP would need a glucagon injection. Page Aff. Ex. 5 at 2. Voulgaropolous also said that a trained adult should operate AP's blood-glucose meter as well as his insulin pump. *Id.* at 1 ("At no time should [AP], or any other child, administer insulin or test blood sugar."). Further, at some point in late March or April, AP's parents forwarded to District 11 a revised form from AP's diabetes clinic about AP's medical needs. Hayes Aff. Ex. 18. On the original form, which AP's parents provided to the school district in the summer of 2005, boxes were checked to indicate (1) that AP could test his blood sugar independently, (2) that AP needed supervision of testing, and (3) that AP needed assistance with testing. Hayes Aff. Ex. 17. On the revised form, boxes for the first two items were no longer checked, but the box for the third item was still checked — that is, the form unambiguously reported that AP would need a staff member to assist him with testing. Hayes Aff. Ex. 18.

After providing these documents, AP's parents met with Haley on May 3 to discuss proposed changes to the Adventures Plus inclusion plan. JP Aff. ¶ 26. Haley told AP's parents to put their requested changes in writing. *Id.* In a letter to AP's parents dated that same day, Haley wrote that it was "not clear from [Volgaropolous's March 28] letter and your communications what specific changes you are seeking to the proposed 504 plan based upon this letter. I would appreciate it if you would contact me at your earliest convenience in this regard." Page Aff. Ex. 6.

AP's parents responded promptly, in a letter dated May 7 and hand-delivered to Haley on May 8.[12] Hayes Aff. Ex. 15; JP Aff. ¶ 27. They reiterated their requests for accommodations as well as their objections to District 11's proposed accommodations. AP's parents said that although AP (then six years old) could often operate both his blood-glucose meter and his insulin pump, they thought that it was "a reasonable accommodation to have 3-4 staff members trained on how to check blood sugar and how to run [AP's] pump." Hayes Aff. Ex. 15 at 1. AP's parents noted that AP "has a hard time checking his own blood sugar" when it is low, and Adventures Plus staff "needs to be ready and able to do it for him if necessary." *Id.* at 2. They also asked that staff members be trained to operate AP's insulin pump so they could suspend the delivery of insulin if his blood sugar became low. *Id.* Further, they said that "[t]here is no reason why 3-4 adults cannot be trained on how to give glucagon in case of an emergency." *Id.* at 1. They pointed out that it would take an ambulance roughly six minutes to get to the school

---

[12]This letter, like Butler's August 15, 2005 letter, is marred by inexplicable redactions. The letter was written by AP's parents to District 11; no justification for the redactions is apparent to the Court.

in the event of an emergency.  *Id.*  AP's parents emphasized their belief that laypersons could be trained to provide all of the requested accommodations:

> If the district is going to state that it is their "policy" that only a trained nurse or health aid do these things then we feel the Adventures Plus program needs to either change their "policy" or hire an RN.  We are not saying that the person taking care of [AP]'s diabetes has to be an RN.  Schools and daycares all across the country have trained adults (not RN's) doing many of these things and that is all that we are asking for.

*Id.* at 2.  In short, AP's parents, in their May 2006 letter, told District 11 yet again what it had been told by AP's parents and doctor in March 2006, and by AP's lawyer in November 2005, and likely by AP's parents in September 2005.

District 11 never responded to this letter.  Weeks, who drafted the Adventures Plus plan in the first place, testified that after the March 1, 2006 meeting, she did not believe that she needed to follow up with AP's parents but that, instead, they needed to file some sort of appeal while Weeks "wait[ed] for the next step in the process."  Weeks. Dep. at 101.  Weeks never saw the post-March 2006 letters from AP's doctors, from Haley to AP's parents, or from AP's parents to Haley.  *Id.* at 112-14.  For her part, Haley did not believe that she had the authority to change the Peter Enich § 504 plan after the March 1 meeting, and she was "referring things [she] got" after the meeting to District 11's lawyer.  Haley Dep. at 66.

But Susan Butler — District 11's special-education director who wrote the initial letter (on August 18, 2005) proposing accommodations to AP's parents — said that it was Haley's responsibility to follow up with AP's parents after the March 1 meeting.  Butler Dep. at 24. Butler received a copy of the May 7, 2006 letter from AP's parents and discussed it with Hiltz, who told Butler that she disagreed with the proposal that Adventures Plus staff be trained to

check AP's blood sugar and operate his insulin pump, as well as with the request that program

staff administer glucagon in an emergency.  *Id.* at 25-26.  Butler did not schedule any follow-up

meetings after getting the letter, she did not contact AP's parents, and she did not direct anyone

to contact them.  *Id.* at 35-36.  In June, the school year ended without anyone at District 11

having responded to AP's parents' May 7 letter.

As the preceding narrative illustrates, District 11's response to AP's parents was slow,

clumsy, unresponsive, and, at times, incompetent.  The Court sympathizes with AP's parents'

frustration with the bureaucratic indifference that they encountered — bureaucratic indifference

that is often encountered by the parents of children with disabilities.  The question for the Court,

though, is not whether District 11 acted efficiently or responsibly, but whether District 11 acted

illegally.  It is to that question that the Court now turns.

## II.  ANALYSIS

### A.  *Standard of Review*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute

over a fact is "material" only if its resolution might affect the outcome of the suit under the

governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a

verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir.

2006).  In considering a motion for summary judgment, a court "must view the evidence and the

inferences that may be reasonably drawn from the evidence in the light most favorable to the

non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B.  Disability Discrimination Through Failure to Accommodate

AP seeks to recover compensatory damages for District 11's failure to accommodate his disability.  Whether AP can do so depends on the answers to two discrete questions:  First, did District 11 violate the laws against disability discrimination by failing to accommodate AP's diabetes?  And second, even if the answer to the first question is "yes," did District 11 act with sufficiently culpable intent to support an award of damages?  In addressing these questions, the Court will first describe the laws and regulations that establish District 11's duty to make reasonable accommodations, the Court will then discuss whether District 11 fulfilled that duty with respect to the specific accommodations sought by AP, and the Court will conclude by examining the issue of District 11's intent.

#### 1.  Statutes and Regulations Governing Disability Discrimination

AP brings federal claims under the ADA and the Rehabilitation Act and state-law claims under the MHRA.  These laws contain similar prohibitions on disability discrimination.

Title II of the ADA applies to public entities such as District 11.  *See generally* 42 U.S.C. §§ 12131-65.  The section of Title II relevant to this case provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

A separate section of Title II defines a "qualified individual with a disability" as:

> an individual with a disability who, with or without reasonable
> modifications to rules, policies, or practices, the removal of

> architectural, communication, or transportation barriers, or the
> provision of auxiliary aids and services, meets the essential
> eligibility requirements for the receipt of services or the
> participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).  And Congress, in the "Findings" section of the ADA (a section that

applies to all portions of the statute, including Title II), observed that "individuals with

disabilities continually encounter various forms of discrimination, including . . . failure to make

modifications to existing facilities and practices . . . ."  42 U.S.C. § 12101(a)(5).

Title II directs the federal government to promulgate regulations to implement the ADA.

42 U.S.C. § 12134.  The implementing regulations prohibit disability discrimination and require

public entities to make reasonable accommodations for disabled persons.  Section 35.130(a) of

title 28 of the Code of Federal Regulations provides:  "No qualified individual with a disability

shall, on the basis of disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any

public entity."  28 C.F.R. § 35.130(a).  The subsection of this regulation related to reasonable

accommodations provides:  "A public entity shall make reasonable modifications in policies,

practices, or procedures when the modifications are necessary to avoid discrimination on the

basis of disability, unless the public entity can demonstrate that making the modifications would

fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

The Supreme Court has called § 35.130(b)(7) the "reasonable-modifications regulation."

*Olmstead v. L.C.*, 527 U.S. 581, 592 (1999).

Like the ADA, the Rehabilitation Act prohibits disability discrimination, but the

Rehabilitation Act, unlike the ADA, applies only to recipients of federal funding (such as

District 11).  The prohibition on discrimination is found in what is known as § 504 of the

Rehabilitation Act, which provides:  "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  The Rehabilitation Act regulations include a provision similar to the ADA's reasonable-modifications regulation discussed above.  Section 41.53 of title 28 of the Code of Federal Regulations, titled "Reasonable accommodation," provides:  "A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program."  28 C.F.R. § 41.53.

Like the ADA and the Rehabilitation Act, the MHRA prohibits disability discrimination.  Minn. Stat. § 363A.12 subd. 1.  Further, like the ADA's reasonable-modifications regulation, the MHRA imposes a reasonable-accommodation requirement and makes available a corresponding "undue-hardship" defense.  The relevant portion of the MHRA provides:

> It is an unfair discriminatory practice to discriminate against any person in the access to, admission to, full utilization of or benefit from any public service because of . . . disability . . . or to fail to ensure physical and program access for disabled persons unless the public service can demonstrate that providing the access would impose an undue hardship on its operation.

*Id.*

The ADA and the Rehabilitation Act provide similar protections to disabled individuals, as courts have often noted.  *See, e.g.*, *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 345 (8th Cir. 2006) ("The Rehabilitation Act and Title I of the ADA are interchangeable in many respects."); *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) ("The rights, procedures, and

- 17 -

enforcement remedies under Title II [of the ADA] are the same as under section 504 [of the Rehabilitation Act].").  And the Eighth Circuit has observed, as has this Court, that the MHRA provides essentially the same protections as the ADA.  *Somers v. City of Minneapolis*, 245 F.3d 782, 788 (8th Cir. 2001) ("Claims under the MHRA are analyzed the same as claims under the ADA."); *Breiland v. Advance Circuits, Inc.*, 976 F. Supp. 858, 864 (D. Minn. 1997).  The Court will therefore generally not distinguish among these three statutes in discussing AP's claims.

The Court notes, however, that the Eighth Circuit has questioned whether the ADA and the Rehabilitation Act require covered entities to make reasonable accommodations for disabled persons.  In *Davis v. Francis Howell School District*, the Eighth Circuit said:  "This court has not determined whether the failure to make reasonable modifications in a policy is itself discrimination even where the policy and its rationale cannot be shown to be discriminatory." 138 F.3d 754, 757 (8th Cir. 1998); *see also Timothy H. v. Cedar Rapids Cmty. Sch. Dist.*, 178 F.3d 968, 972 (8th Cir. 1998) (discussing *Davis*).

At issue in *Davis* was a school district's policy prohibiting school nurses from administering medication to students in amounts exceeding the dosage recommended in the Physician's Desk Reference ("PDR"), a widely used medical reference work.  *Davis*, 138 F.3d at 755.  Davis, whose prescribed dosage of medication for attention-deficit-hyperactivity disorder exceeded the dosage recommended in the PDR, brought claims under Title II of the ADA and the Rehabilitation Act challenging the school district's refusal to administer the medication in the dosage prescribed.  *Id.*  The court held that the school district did not discriminate against Davis because the school's medication policy applied to all students, disabled and non-disabled. *Id.* at 756 ("The Davises have not offered evidence that the school district's action was taken

- 18 -

because of [Davis's] disability rather than because of its policy and underlying concerns about student health and potential liability. They have therefore failed to establish a required element of their claims.").

The court then turned to Davis's argument that the school district discriminated against him when it refused to accommodate his disability by excepting him from the district's general prescription-drug policy. The court rejected this argument because it found that the district had offered Davis a different reasonable accommodation. *Id.* at 757. (The district offered to allow Davis's parents or their designee to come to school to administer the medication.) The court therefore had no need to decide the question that it said was open — that is, the question whether a public entity's failure to reasonably modify a disability-neutral policy can qualify as disability discrimination in violation of the ADA and the Rehabilitation Act. *See id.*

This Court, however, has no choice but to decide that question, because this case involves only claims based on District 11's failure to provide reasonable accommodations to AP, including an accommodation (the administration of glucagon) that would have required District 11 to modify its policy against training laypersons to give most types of injections. And although this question may be open, this question is not, in this Court's opinion at least, in serious doubt. The failure to provide reasonable accommodations — including the failure to provide a reasonable accommodation by modifying a disability-neutral policy — can indeed constitute disability discrimination in violation of the ADA, the Rehabilitation Act, and the MHRA.

Several aspects of the ADA and its implementing regulations make it clear that covered entities have a duty to grant reasonable accommodations to disabled persons. As noted above,

- 19 -

the "Findings" section of the ADA explicitly identifies the "failure to make modifications to existing facilities and practices" as one of the "various forms of discrimination" at which the law is directed.  42 U.S.C. § 12101(a)(5).  Further, embedded in Title II's definition of a "qualified individual with a disability" is language reflecting the duty to make reasonable accommodations. *See* 42 U.S.C. § 12131(2) (defining "qualified individual with a disability" as someone who meets eligibility requirements "with or without reasonable modifications to rules, policies, or practices").  Finally, the reasonable-modifications regulation — which, of course, has the force of law — requires covered entities to provide reasonable accommodations unless doing so would "fundamentally alter" the affected program.  28 C.F.R. § 35.130(b)(7).

Supreme Court case law also supports reading federal laws against disability discrimination broadly enough to reach failure-to-accommodate claims.  In discussing the legislative history of the Rehabilitation Act, the Court observed:  "Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of  thoughtlessness and indifference — of benign neglect."  *Alexander v. Choate*, 469 U.S. 287, 295 (1985).  And in *Olmstead v. L.C.*, in upholding a finding of discrimination under the ADA against mental patients who were institutionalized rather than given the community placements recommended by their doctors, the Court characterized the challenged conduct this way:

> Dissimilar treatment correspondingly exists in this key respect:  In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given *reasonable accommodations*, while persons without mental disabilities can receive the medical services they need without similar sacrifice.

527 U.S. 581, 601 (1999) (emphasis added).  *Olmstead* rejected the state's argument that it had

not discriminated against the plaintiffs "'by reason of' their disability because they were not

denied community placement on account of those disabilities."  *Id.* at 598.  The Court said:  "We

are satisfied that Congress had a more comprehensive view of the concept of discrimination

advanced in the ADA."  *Id.*

   *Alexander* and *Olmstead* therefore support this Court's conclusion that the ADA and the

Rehabilitation Act prohibit, as a type of disability discrimination, the failure to provide

reasonable accommodations to a disabled person.  Decisions from federal appeals courts other

than the Eighth Circuit also support this conclusion.  For instance, the Seventh Circuit held, after

carefully analyzing the question, that "it is possible to demonstrate discrimination on the basis of

disability by a defendant's refusal to make a reasonable accommodation."  *Washington v. Ind.*

*High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 848 (7th Cir. 1999); *see also McPherson v. Mich.*

*High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 460 (6th Cir. 1997) (holding that one way for the

plaintiff to establish discrimination under Title II of the ADA and the Rehabilitation Act would

be to show that the defendant "could have reasonably accommodated his disability, but refused

to do so"); *Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir. 1996) ("Congress intended the

ADA to cover at least some so-called disparate impact cases of discrimination . . . .").

## 2.  District 11's Duty to Accommodate

   The parties do not dispute that AP's diabetes is a disability.  District 11 was therefore

required by law to make accommodations for AP's diabetes in Adventures Plus — but only those

accommodations that were reasonable and necessary.  *See* 28 C.F.R. § 35.130(b)(7)*; McDavid v.*

*Arthur*, 437 F. Supp. 2d 425, 428 (D. Md. 2006); *Pathways Psychosocial v. Town of*

- 21 -

*Leonardtown*, 133 F. Supp. 2d 772, 789 (D. Md. 2001).  AP bears the burden of proof on the

reasonableness and necessity of the requested accommodations.  *See* 42 U.S.C. § 12131(2)

(defining "qualified individual with a disability," an element of the plaintiff's case); *McDavid v.*

*Arthur*, 437 F. Supp. 2d at 428; *Pathways Psychosocial*, 133 F. Supp. 2d at 789.  But District 11

can defend itself by establishing that the requested accommodations would fundamentally alter

Adventures Plus or place an undue burden on District 11.  *See* 28 C.F.R. § 35.130(b)(7); 28

C.F.R. § 41.53; *Olmstead*, 527 U.S. at 606 n.16 (plurality opinion); *Gorman v. Bartch*, 152 F.3d

907, 912 (8th Cir. 1998).  District 11 bears the burden of proof on these two defenses.[13]  *See,*

*e.g., Gorman*, 152 F.3d at 912.

AP's parents asked District 11 to accommodate AP's diabetes by providing staff that

were trained and willing to do three things:  (1) check his blood sugar, which requires operating

his blood-glucose meter; (2) operate his insulin pump; and (3) give glucagon injections in the

event of a hypoglycemic emergency.  Because the former two accommodations are similar, the

Court will discuss them together.  The Court will then discuss the glucagon-injection request.

*a.  Operation of Blood-Glucose Meter and Insulin Pump*

In its opening brief, District 11 inexplicably does not address AP's parents' requests that

Adventures Plus staff be trained and willing to operate AP's blood-glucose meter and insulin

pump — even though, for over two years now, these requests have made up two-thirds of AP's

reasonable-accommodations claim.  AP therefore asks, in his opposition brief, that the Court

---

[13]Because a proposed accommodation is necessarily not reasonable if it imposes an undue
burden on a defendant, the same evidence that supports a finding that a plaintiff did not prove an
element of its case (i.e., that the requested accommodation is reasonable) will usually also
support a finding that the defendant proved its affirmative defense (i.e., that providing the
accommodation would be an undue burden or cause a fundamental alteration).

- 22 -

grant summary judgment in *his* favor and hold that these were reasonable accommodations.  Pl. Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 18-20 [Docket No. 52].  Recognizing that he did not move for summary judgment, however, AP asks the Court to exercise its power to grant summary judgment sua sponte.  *Id.* at 18-19.  The Court declines to do so.

District 11, in its reply brief, does not argue that it was unreasonable for AP's parents to ask for accommodations with respect to AP's blood-glucose meter and his insulin pump.  Rather, District 11 contends that it agreed to provide whatever accommodations AP's parents asked for in the fall of 2005 with respect to the blood-glucose meter and insulin pump.  Def. Reply Mem. at 3 [Docket No. 56].  Alternatively, District 11 contends that before March 2006, AP's parents never asked the district to train Adventures Plus staff to operate AP's blood-glucose meter and insulin pump.  *Id.*  District 11 is plainly wrong on the second point; Page's November 2005 letter requested both accommodations.  *See* Page Aff. Ex. 4.  But the Court nevertheless finds that the record with respect to these accommodations is not sufficiently clear to warrant summary judgment in AP's favor.

The Court acknowledges that AP is likely to be able to establish at trial that it was reasonable to ask that Adventures Plus staff be trained and willing to operate AP's blood-glucose meter and his insulin pump for him if he was unable to do so.  The Court also believes that District 11 is unlikely to be able to establish to a jury's satisfaction that granting either accommodation would have been an undue burden upon it or would have fundamentally altered the Adventures Plus program.  But neither party spent much time briefing this issue, and there is conflicting testimony from District 11 employees as to whether and when they knew that AP's parents asked for these accommodations and as to whether and when District 11 agreed to

provide them.  Accordingly, the Court will leave these claims to be decided at trial — either by

the jury or, if the evidence is sufficiently one-sided, by the Court on motion for judgment as a

matter of law.

### b.  Glucagon Administration

District 11 argues that AP's parents' request that Adventures Plus staff be trained and

authorized to administer glucagon is unreasonable and would place an undue burden on the

district or would fundamentally alter the Adventures Plus program.  Def. Mem. Supp. Mot. S.J.

("Def. SJ Mem.") at 29-34 [Docket No. 48].  The Court finds that the reasonableness and

burdensomeness of the requested accommodation present questions of fact that cannot be

resolved on summary judgment.

AP has presented evidence that other day-care programs have agreed to train laypersons

to provide glucagon injections to AP in the event of an emergency.  JP Dep. at 17, 20-23, 26-27,

52; JP Aff. ¶¶ 5-6, 31.  There is also evidence, in the form of the *McDavid v. Arthur* case from

the federal district court in Maryland, that at least one other public program agreed to train some

staff members to give emergency glucagon injections to children.  437 F. Supp. 2d 425, 427 (D.

Md. 2006).[14]  Finally, AP's expert witness, Christine Day, has said that laypersons can be trained

---

[14]District 11 argues that, based on *McDavid*, the Court should find that AP's parents'
request with respect to glucagon injections is unreasonable and unduly burdensome or would
require a fundamental alteration in Adventures Plus.  Def. SJ Mem. at 32-34.  The Court
disagrees, for three reasons.  First, the defendant public entity in *McDavid* did agree to train
*some* staff members to administer glucagon; the question in that case was whether it was
reasonable for the parents of a diabetic child to require that such a trained staff person be
available at all times.  437 F. Supp. 2d at 428-29.  Further, the parents in *McDavid* — unlike
AP's parents — refused to release the defendant from liability with respect to glucagon
injections.  *Id.* at 427, 429.  Finally, *McDavid* cited almost no evidence supporting its conclusion
that the requested accommodation would be an undue burden upon or require fundamental
alteration of the defendant's program.  *Id.* at 429.

to give glucagon injections.  Page Aff. Ex. 8 at 6 ("[T]he . . . glucagon emergency kit [is] designed and intended for use by laypersons and [is] easy to use in an emergency situation."). All of this evidence weighs in favor of finding that the requested accommodation is reasonable and would neither be unduly burdensome to District 11 nor alter fundamentally the Adventures Plus program.[15]

The evidence is undisputed, however, that giving a glucagon injection is a multi-step process that involves first injecting liquid into a vial of powder to dissolve the powder, then drawing the resulting solution back into the syringe, and then injecting the solution into the patient.  JP Dep. at 23; Hiltz Dep. at 13-14.  Further, because glucagon is only necessary in an emergency, the person required to administer the injection will likely be under considerable stress and perhaps facing challenging conditions.  For example, it is possible that the patient to be injected could be having a seizure as the injection is being administered.  Hiltz Dep. at 14.

Further, District 11 has presented evidence that the Minnesota Department of Health's guidelines for school nurses could be interpreted to prohibit nurses from delegating to an unsupervised layperson the task of injecting glucagon.  Hayes Aff. Ex. 21 at 8 (Minnesota Guidelines for Medication Administration in Schools — Guideline 4.2 (May/Sept. 2005)).  Hiltz, District 11's Health Services Coordinator, recommended against having Adventures Plus staff

---

[15]AP also provided evidence that guidelines promulgated by the American Diabetes Association anticipate that laypersons will provide glucagon injections in emergencies.  Page Aff. Ex. 2.  District 11 asks the Court to ignore this evidence, arguing that it was not disclosed in discovery.  Def. Reply Mem. at 1.  Although the Court is skeptical of District 11's argument — not least because District 11 has not told the Court what particular discovery requests it made that would have covered such materials — the Court has not considered the challenged exhibit. Even without it, the reasonableness of the requested glucagon-injection accommodation is a disputed question of fact.

trained to inject glucagon because Adventures Plus does not have a nurse on staff to do training

or provide supervision with respect to such injections.  Hiltz Dep. at 33-34.  District 11 therefore

argues that, to provide emergency glucagon injections as AP's parents asked, the district would

have to hire a registered nurse in every day-care program in which a diabetic child is enrolled.

Def. SJ Mem. at 31.[16]  The district argues that this would create an undue burden, as would

training laypersons to administer glucagon.  *Id.*[17]

On this record, the Court cannot decide, as a matter of law, whether the requested

glucagon-injection accommodation was reasonable and necessary, or whether the requested

accommodation would fundamentally alter Adventures Plus or place an undue burden on

District 11.  But that is not the end of the matter.  To secure compensatory damages, AP must do

more than establish that District 11 was legally required to accommodate his disability by

training Adventures Plus staff to administer glucagon in an emergency.  AP also must establish

that, when District 11 refused to provide this accommodation, District 11 acted with sufficiently

culpable intent.  As discussed below, the Court *is* able to decide, as a matter of law, that AP

cannot make this showing.  Thus, regardless of whether the requested accommodation was

---

[16]District 11 also argues that it "would be exposed to an undue threat and burden of
unlimited liability in the event that a student attending daycare suffered injury as a result of a
glucagon injection."  Def. SJ Mem. at 31.  This will not be true, however, if the parents
requesting the accommodation sign a liability waiver — as AP's parents offered to do.

[17]District 11 also contends that AP's parents "have requested that the Adventures Plus
program train its entire staff to administer glucagon on a regular basis, which will most certainly
entail substantial cost, not only for the training, but for payment of wages to the employees for
time spent in training."  Def. SJ Mem. at 31.  The Court has not considered this argument, for
two reasons.  First, the premise is false:  AP's parents have requested only that some, but not all,
staff members at Adventures Plus be trained to administer glucagon in emergencies.  Second,
there is no evidence in the record that such training — which AP's parents agreed to provide —
would impose "substantial cost" on District 11.

- 26 -

reasonable or not — and regardless of whether the requested accommodation would fundamentally alter Adventures Plus or place an undue burden on District 11 — District 11 is entitled to summary judgment on the glucagon-injection claim.

3.  Intent[18]

District 11 argues that, even if it acted unlawfully in refusing to train staff members at Adventures Plus to administer glucagon injections, its intent was not sufficiently culpable to render it liable.  Def. SJ Mem. at 32.  Implicit in District 11's argument is the assumption that "discriminatory animus" is a precondition to liability, but unfortunately District 11 does not address the point explicitly, and it cites no case law to support its assumption.  *Id.*

AP has briefed this point more carefully than District 11.  AP concedes that he must show some type of intent on District 11's part to recover compensatory damages, but he argues that either "discriminatory animus" or "deliberate indifference" will do.  Pl. SJ Opp. at 28.  AP supports his argument with citations to a Ninth Circuit case and to a case from the Western District of Arkansas.  *Id.* (citing *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) and *Matthews v. Jefferson*, 29 F. Supp. 2d 525, 536 (W.D. Ark. 1998)).

The Eighth Circuit has not squarely decided what type of intent on the part of a defendant must be proven in a disability-discrimination case in order to entitle the plaintiff to an award of compensatory damages.  A key case on the subject is *Monahan v. Nebraska*, 687 F.2d 1164 (8th Cir. 1982).  The plaintiffs in *Monahan* brought claims under § 504 of the Rehabilitation Act and

---

[18]AP bears the burden of establishing that District 11 acted with the requisite intent to establish liability for disability discrimination.  District 11's intent is also relevant to its immunity defenses, on which District 11 bears the burden of proof.  Immunity is discussed separately below.

the Education for All Handicapped Children Act of 1975 (the "EAHCA," which was the predecessor to the Individuals with Disabilities Education Act or "IDEA").[19]  The court construed the plaintiffs' complaint to rest only on "procedural theories" of injury that the court rejected, and the court therefore upheld the district court's dismissal of the complaint without prejudice.  687 F.2d at 1170.

The plaintiffs, however, also argued on appeal that they were entitled to seek damages under § 504 for "allegedly substantively improper educational placement, as opposed to claimed procedural defects in the Nebraska statutes . . . ."  *Id.* at 1169.  The Eighth Circuit found that the complaint did not adequately raise such substantive claims.  *Id.* at 1170.  But in anticipation that the plaintiffs would refile their complaint and would include claims for damages based on a substantive challenge to an educational placement, the court went on to "add a few words for the guidance of the District Court and the parties" about those anticipated claims — claims that were not then before the court.  *Id.* at 1170.

The court noted that "[e]xperts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter."  *Id.*  The court also contrasted the Rehabilitation Act and the EAHCA, emphasizing that they "are entirely different statutes."  *Id.*  Relying on *Southeastern Community College v. Davis*, 442 U.S. 397, 411 (1979), the Eighth Circuit said that the Rehabilitation Act "is not, generally speaking, and affirmative action statute," but rather "is simply a prohibition of certain conduct on the part of recipients of federal financial assistance."  687 F.2d at 1170.  In light of § 504's

---

[19]*See* Education for All Handicapped Children Act, Pub. L. No. 94–142, 89 Stat. 773 (1975); Individuals With Disabilities Education Act, 20 U.S.C. §§ 1400-82.

language prohibiting discrimination "solely by reason of . . . handicap," the court said:

"Manifestly, in order to show violation of the Rehabilitation Act, *something more* than a mere

failure to provide the 'free appropriate education' required by the EAHCA must be shown."   *Id.*

(emphasis added).

That "something more," said the Eighth Circuit, is "bad faith or gross misjudgment" on

the part of a school district.   *Id.* at 1171.   Subsequent cases have suggested that *Monahan*

established that bad faith or gross misjudgment is a necessary precondition to *any* § 504 claim.

*See, e.g.*, *M.P. v. Indep. Sch. Dist. No. 721*, 439 F.3d 865, 867 (8th Cir. 2006) (citing *Monahan*

and saying, "[t]he plaintiff must also show bad faith or gross misjudgment to make a successful

Section 504 violation claim").   But *Monahan*'s rationale for this standard was specific to claims

about the substantive quality of an educational plan for disabled child, as the original context

makes clear.   *Monahan* said:

> We do not read section 504 as creating general tort liability for
> educational malpractice, especially since the Supreme Court, in
> interpreting the EAHCA itself, has warned against a court's
> substitution of its own judgment for educational decisions made by
> state officials.   We think, rather, that either bad faith or gross
> misjudgment should be shown before a section 504 violation can
> be made out, at least in the context of education of handicapped
> children.

687 F.2d at 1170-71.

There are at least two good reasons not to extend *Monahan*'s "bad faith or gross

misjudgment" dictum beyond the context of substantive challenges to a disabled child's

individualized education plan.[20]   First, the Supreme Court has undercut *Monahan*'s assertion that

---

[20]In precedential opinions, the Eighth Circuit has applied *Monahan*'s "bad faith or gross
misjudgment" standard only in cases featuring IDEA claims along with claims of disability

- 29 -

§ 504 is not "generally speaking, an affirmative-action statute," 687 F.2d at 1170, an assertion

that was based on the Supreme Court's decision in *Southeastern Community College v. Davis,*

442 U.S. at 411.  In *Alexander v. Choate*, the Court clarified what it meant in *Davis* by the term

"affirmative action."  469 U.S. 287, 300 n.20 (1985).  Acknowledging that commentators

criticized *Davis* "for failing to appreciate the difference between affirmative action and

reasonable accommodation," the Court said:

> Regardless of the aptness of our choice of words in *Davis*, it is
> clear from the context of *Davis* that the term "affirmative action"
> referred to those "changes," "adjustments," or "modifications" to
> existing programs that would be "substantial," or that would
> constitute "fundamental [alterations] in the nature of a
> program . . . ," rather than to those changes that would be
> reasonable accommodations.

*Id*. at 300 n.20 (citations omitted; alterations in original).

Second, the Supreme Court has established that money damages are available under

Title IX if a plaintiff can establish the defendant's "deliberate indifference to discrimination."

*Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 290 (1998).  As *Gebser* noted, Title IX

----

discrimination, and the court has generally said that the standard applies in connection with
claims related to educational services.  *See M.P. v. Indep. Sch. Dist. No. 721*, 439 F.3d 865, 867-
68 (8th Cir. 2006); *Bradley ex rel. Bradley v. Ark. Dep't of Educ.*, 301 F.3d 952, 954-56 (8th Cir.
2002); *Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 852, 856 (8th Cir. 2000) ("Where alleged
ADA and § 504 violations are based on educational services for disabled children, the plaintiff
must prove that school officials acted in bad faith or with gross misjudgment."); *Smith v. Special
Sch. Dist. No. 1*, 184 F.3d 764, 769 (8th Cir. 1999); *Hoekstra v. Indep. Sch. Dist. No. 283*, 103
F.3d 624, 627 (8th Cir. 1996) ("[I]n the context of educational services for disabled children, a
showing of gross misjudgment or bad faith on the part of school officials is necessary to succeed
on an ADA claim."); *Heidemann v. Rother*, 84 F.3d 1021, 1031-33 (8th Cir. 1996).  *Cf. Keith v.
Allen*, No. 97-4101, 1998 U.S. App. LEXIS 23874, at *2 (8th Cir. Sept. 22, 1998) (in case
involving only claims against a school district under the ADA and § 504 (i.e., not the IDEA),
upholding judgment as a matter of law because no jury could conclude that the district "denied
[plaintiff] access to or participation in school services, programs, or activities in bad faith or that
its school officials exercised gross misjudgment.").

was modeled after Title VI of the Civil Rights Act of 1964. *Id.* at 286. And the remedial reach

of both § 504 and the ADA is defined, directly or indirectly, by reference to Title VI.[21] Given

the close connection between Title IX and Title VI, this Court believes that the Supreme Court

would require deliberate indifference as a condition of recovering money damages under

Title VI, as it did under Title IX in *Gebser*. Deliberate indifference is therefore also necessary

— and sufficient — to recover compensatory damages under the ADA or § 504, at least in cases

not involving challenges to educational services.

The Court assumes for the sake of argument that, notwithstanding *Gebser*, the Eighth

Circuit's requirement of bad faith or gross misjudgment still applies in cases challenging

substantive educational services provided to disabled children. This case, however, involves

only AP's claims with respect to the Adventures Plus day-care program. Significantly, AP has

not brought any claims under the IDEA. And even if Adventures Plus could be considered the

equivalent of an educational program, the Court would not apply the *Monahan* bad-faith/gross-

misjudgment standard because AP's claims relate only tangentially to education. AP's parents

asked District 11 to accommodate AP's diabetes so that he would be safe and healthy at

Adventures Plus; this is more like asking District 11 to accommodate a wheelchair-bound

student by installing a ramp or widening doors than it is like asking for specific educational

services.

---

[21]*See* 29 U.S.C. § 794a(a)(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."); 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in section 794a of title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.").

The court therefore agrees with *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001), the case on which AP primarily relies, that compensatory damages are generally available under the ADA and § 504 on a showing of deliberate indifference by the defendant.  *See* Pl. SJ Opp. at 28.  The Court does not, however, agree with *Duvall*'s assessment of the meaning of the term "deliberate indifference" in the reasonable-accommodation context.

*Duvall* correctly said that deliberate indifference "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood."  260 F.3d at 1139 (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1988)).  But *Duvall* then drained this standard of almost all meaning in failure-to-accommodate cases by holding that once a plaintiff "has alerted the public entity to his need for accommodation . . . , the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test."  260 F.3d at 1139.  This appears to overlook the fact that not every requested accommodation is reasonable.  As to the second element of the deliberate-indifference test, *Duvall* held that the "failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness."  *Id.* at 1140.  This vague and empty formula — which tells us that "deliberate indifference" requires "an element of deliberateness" — seems to hold out the prospect that "deliberate indifference" could exist wherever a plaintiff asks for any kind of an accommodation and a public agency deliberately (i.e., not accidentally) refuses to grant that accommodation.

The Supreme Court, however, has described deliberate indifference as a "stringent standard of fault . . . ." *Board of Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).  "A showing of simple or even heightened negligence will not suffice" to establish deliberate indifference.  *Id.* at

407.  Rather, a defendant is deliberately indifferent only if he acts with "conscious disregard" for a plaintiff's rights.  *Id.*  Such conscious disregard exists only if either (1) the defendant actually knows that its actions will violate the plaintiff's rights or (2) such a violation is the "plainly obvious consequence" of the defendant's actions.  *Id.* at 410, 412; *see also Gebser*, 524 U.S. at 291 (citing *Brown*).

Accordingly, in a failure-to-accommodate case such as this one, to establish deliberate indifference on the part of the defendant, a plaintiff must show:  (1) that the plaintiff requested the accommodation; (2) that it was "plainly obvious" that the accommodation was reasonable and necessary; and (3) if the defendant has raised the undue-burden/fundamental-alteration defense, that it was "plainly obvious" when the plaintiff requested the accommodation that granting it would *not* have created an undue burden on the defendant and would *not* have fundamentally altered its program.  Put another way, with respect to the undue-burden/fundamental-alteration defense, not only must the defendant fail to make out the defense (because a defendant who *does* make out the defense is not liable for compensatory damages or anything else), but the plaintiff must also establish that it was plainly obvious that the defense would fail.  If the defendant could have reasonably believed that the undue-burden/fundamental-alteration defense would succeed, then the defendant will not be liable for compensatory damages.

A defendant is therefore entitled to summary judgment on a compensatory-damages claim if either (1) no reasonable jury could find that it was "plainly obvious" that a requested accommodation was reasonable, or (2) no reasonable jury could find that it was "plainly

obvious" when the accommodation was requested that an undue-burden/fundamental-alteration defense would fail.[22]

In this case, AP challenges District 11's failure to provide three different accommodations.  AP contends that District 11 should have agreed to ensure that District 11 staff were trained and willing to (1) check AP's blood-glucose level using his glucose meter, (2) operate his insulin pump, and (3) administer glucagon injections in the event of an emergency.

With respect to the glucagon-injection request, the Court agrees with District 11 that it is entitled to summary judgment that it was not deliberately indifferent to AP's rights under the ADA and § 504 when it refused to grant the requested accommodation.  District 11 has presented evidence that statewide guidelines discourage the administration of glucagon injections by school personnel who are not supervised by school nurses.  The evidence is undisputed that providing glucagon injections is at least a modestly complicated operation.  And both Hiltz and Nikolic agreed that an unsupervised layperson should not administer a glucagon injection.  Hiltz Dep. at 34; Nikolic Dep. at 20 ("I personally would never instruct someone in giving an injectable medication when I was not going to be around to supervise them.").  District 11 therefore believed that it would have to hire a nurse for the Adventures Plus program to grant the requested accommodation.

_____

[22]Note that a defendant can defeat a compensatory-damages claim even if a reasonable jury could find that a plaintiff was in fact entitled to the accommodation he or she requested.  To defeat such a claim, the defendant need only demonstrate that it was *not plainly obvious* that the plaintiff was entitled to the accommodation.

On this record, then, no reasonably jury could find that it was "plainly obvious" that the glucagon-injection request was a reasonable accommodation.  Nor could a reasonable jury find that it was "plainly obvious" that the requested accommodation would *not* have placed an undue burden on District 11 and would *not* have fundamentally altered the Adventures Plus program. The Court therefore grants summary judgment to District 11 with respect to AP's glucagon-injection-related claims for compensatory damages, because no reasonable jury could find that District 11 was deliberately indifferent to AP's right to reasonable accommodations for his diabetes when the district refused to train the Adventures Plus staff to administer glucagon.

The Court does not, however, find that District 11 is entitled to summary judgment with respect to AP's compensatory-damages claims based on blood-glucose testing and operation of AP's insulin pump.  Both of these requested accommodations were almost certainly reasonable, and almost surely would not have imposed an undue burden on District 11 or fundamentally altered the Adventures Plus program (although, as noted above, the Court leaves these questions to be decided at trial).  Moreover, a reasonable jury could find that it was "plainly obvious" that District 11 should have granted these accommodations to AP and that it was "plainly obvious" that doing so would not have been unduly burdensome.  District 11 is therefore not entitled to summary judgment in its favor on the question of intent as to these accommodations.

### C. Immunity

#### 1. State Law

District 11 contends that the Minnesota doctrine of "official immunity" shields it from liability under the MHRA.  Def. SJ Mem. at 36-37.  (Obviously, state law cannot shield District 11 from claims under the ADA and the Rehabilitation Act.)  The Court agrees with

District 11 that it is immune from liability under the MHRA for AP's claims based on the refusal

to administer glucagon.  But the Court will leave for trial the question whether District 11 is

immune from liability under the MHRA for AP's claims based on blood-glucose monitoring and

insulin-pump operation.

Under Minnesota's common-law doctrine of official immunity, a public official who

takes action that requires "the exercise of his judgment or discretion" is generally not personally

liable for damages resulting from that action.[23]  *Anderson v. Anoka Hennepin Indep. Sch.*

*Dist. 11*, 678 N.W.2d 651, 655 (Minn. 2004) (quotations omitted).  Conversely, official

immunity does not protect public officials from liability arising from "the execution of

ministerial, rather than discretionary, functions . . . ."  *Id.*

The key decision maker for District 11 was Hiltz; other district officials simply followed

her recommendations.  District 11 has presented no evidence of a district-wide policy governing

the accommodations requested by AP in this case.  Rather, the evidence demonstrates that it was

Hiltz's professional judgment that District 11 should not provide the three accommodations

requested by AP's parents.  Accordingly, Hiltz is presumptively entitled to official immunity for

---

[23]"Official immunity" is distinct from "statutory immunity," which applies directly to
government entities.  "Statutory immunity is extended when there has been a planning-level
decision; that is, social, political, or economic considerations have been evaluated and weighed
as part of the decision-making process."  *Schroeder v. St. Louis County*, 708 N.W.2d 497, 504
(Minn. 2006).  District 11 has not raised the defense of statutory immunity.  But because
statutory immunity "does not extend to operational-level decisions, [i.e.,] those involving . . . the
exercise of professional judgment," *id.*, it appears likely that such immunity would not protect
District 11 in this case.  The district's decision about what accommodations to provide to AP
was driven primarily by Hiltz's exercise of professional judgment, and not by a "planning-level
decision" that reflected broad-based "social, political, or economic considerations."  *Id.*

her discretionary, non-ministerial decision to recommend that the district deny those
accommodations.

But public officials are not entitled to official immunity for discretionary decisions if the
officials act willfully or with malice. *Schroeder*, 708 N.W.2d at 505. In this context, to act
"willfully" is to "violate[] a known right," and the inquiry is objective, not subjective. *Gleason
v. Met. Council Transit Operations*, 563 N.W.2d 309, 315 (Minn. Ct. App. 1997), *aff'd in part,
rev'd in part*, 582 N.W.2d 216 (Minn. 1998). The applicable standard "contemplates less of a
subjective inquiry into malice, which was traditionally favored at common law, and more of an
objective inquiry into the legal reasonableness of an official's actions." *State by Beaulieu v. City
of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994); *see also Gleason*, 563 N.W.2d at 315
(citing *Beaulieu*).

The Court holds, as the parties seemed to agree at oral argument, that this objective
inquiry into legal reasonableness is the same as the inquiry into whether District 11's intent was
sufficiently culpable to support liability for compensatory damages under the ADA and the
Rehabilitation Act. In other words, the Court holds that, to establish that Hiltz's conduct in this
case was objectively unreasonable and therefore not covered by official immunity, AP must
establish that Hiltz was deliberately indifferent to AP's right to reasonable accommodations
under the MHRA.

The Court's earlier analysis with respect to deliberate indifference under the ADA and
the Rehabilitation Act therefore still applies. For the reasons already given, the Court finds, as a
matter of law, that Hiltz is entitled to official immunity with respect to the glucagon-injection

request, but that a jury would have to decide whether Hiltz is entitled to immunity with respect to the requests for blood-glucose testing and insulin-pump operation.

Of course, it is District 11, and not Hiltz, who is the defendant in this action, and the doctrine of official immunity applies *directly* only to public officials (such as Hiltz), and not to public entities (such as District 11). The Minnesota Supreme Court, however, held in *Schroeder v. St. Louis County* that it will extend *vicarious* official immunity to public entities if it concludes that public policy warrants such an extension. 708 N.W.2d 497, 508 (Minn. 2006) ("Ultimately, the extension of vicarious official immunity is a policy question for the court."). *Schroeder* explained that vicarious official immunity will be extended "when failure to grant it would focus stifling attention on an official's performance to the serious detriment of that performance." *Id.* (quotations omitted).

What is "stifling attention"? The Minnesota Supreme Court has not been specific, but the standard is clearly not terribly demanding. Over time, Minnesota courts have extended official vicarious immunity so often and under so many circumstances that the Minnesota Supreme Court recently summarized the law as follows: "Generally, if a public official is found to be immune from suit on a particular issue, his or her government employer will be vicariously immune from a suit arising from the employee's conduct and claims against the employer are dismissed without explanation." *Anderson*, 678 N.W.2d at 663-64. In other words, in recent years, when Minnesota courts have found that direct official immunity protected a public official, they have, almost as a matter of course, found that vicarious official immunity protected the public agency that employed the official.

Two recent cases illustrate how far the Minnesota Supreme Court itself has gone in extending vicarious official immunity to public entities.  In *Schroeder*, the court afforded a county vicarious official immunity from liability for damages that resulted from a highway accident in which a driver collided with a county-operated road-grading machine that was operating against traffic.  708 N.W.2d at 508   *Schroeder* found that the county's decision to allow grading against traffic "was based on the collective knowledge and experience of the county road superintendents and maintenance staff who took into consideration . . . various economic and safety factors" and that vicarious official immunity was warranted so as not to discourage the county from "us[ing] its experience and knowledge to create protocols and policies in the future with respect to the grading of its roads."  *Id.*  And in *Anderson*, the Minnesota Supreme Court extended vicarious official immunity to a school district for claims resulting from a table-saw accident in a shop class.  678 N.W.2d at 664.  The policy at issue in *Anderson* was the school district's determination that table saws could sometimes be operated without blade guards, and the specific decision by an official that resulted in harm (an amputated finger) was a shop teacher's instruction to a student to cut some wood with the blade guard disengaged.  *Id.* at 664.

As *Schroeder* and *Anderson* illustrate, the Minnesota Supreme Court has not hesitated to extend vicarious official immunity to governmental entities in circumstances in which direct official immunity would protect the responsible governmental employees.  If the county in *Schroeder* was vicariously immune from liability for the decision of a heavy-equipment operator about the operation of a road-grading machine, and if the school district in *Anderson* was vicariously immune from liability for the decision of a shop teacher about the operation of a

table saw, then surely District 11 is entitled to vicarious immunity for the decision of Hiltz about whether the staff of Adventures Plus should be trained to administer glucagon injections to a diabetic child in a medical emergency.

In sum, the Court finds that District 11 (through Hiltz) is entitled to vicarious official immunity from liability under the MHRA with respect to the glucagon-injection request, but that a jury must decide whether District 11 (through Hiltz) is entitled to vicarious official immunity from liability under the MHRA with respect to the requests for blood-glucose testing and for insulin-pump operation.

### 2.  Federal Law

District 11 asserts in its opening brief that it is entitled to qualified immunity from AP's federal damages claims.  Def. SJ Mem. at 37-38.  District 11 relies on *Lue v. Moore*, in which the Eighth Circuit held that "qualified immunity is available in Rehabilitation Act actions seeking damages from *public officials*."  43 F.3d 1203, 1205 (8th Cir. 1994) (emphasis added).  But District 11 is not a public official; it is a public *entity*.  District 11 is therefore not entitled to qualified immunity.  The Court appreciates that District 11 conceded as much at oral argument, but the Court reminds District 11 that Fed. R. Civ. P. 11(b) requires not merely that frivolous arguments be abandoned, but that they not be made in the first place.

### D.  Miscellaneous Defenses

### 1.  Standing

District 11 contends that AP lacks standing because he will not be enrolling in a District 11-run school in the future.  Def. SJ Mem. at 25.  This would be a good argument if AP were seeking injunctive relief.  But Magistrate Judge Jeanne J. Graham already ordered AP to

file an amended complaint that does not seek injunctive relief, and AP complied with that order.

*See* Order Oct. 12, 2006 [Docket No. 27]; Am. Compl. [Docket No. 28].   District 11's argument

is plainly meritless.

District 11 also contends that AP lacks standing to proceed against Peter Enich because

he "sustained no actual damages" from District 11's conduct with respect to Peter Enich.  Def.

SJ Mem. at 26.  This might be a good argument if AP were seeking damages for District 11's

failure to accommodate him at Peter Enich.  But in his amended complaint, AP brings claims

only with respect to Adventures Plus, not with respect to Peter Enich.  Again, District 11's

argument is obviously meritless.

As Judge Graham told District 11 in her October 12, 2006 order, AP "plainly has

standing to pursue an action for damages."  Order Oct. 12, 2006 at 4.  The Court notes that

District 11 conceded this point at oral argument, and the Court appreciates this concession.

Again, though, it is difficult to understand how District 11's attorneys could have certified to this

Court that, "after an inquiry reasonable under the circumstance," those attorneys concluded that

these standing arguments were "warranted by existing law or by a nonfrivolous argument for

extending, modifying, or reversing existing law . . . ."  Fed. R. Civ. P. 11(b)(2).

2.   Exhaustion

District 11 argues that AP's federal claims should be dismissed because he failed to

exhaust his administrative remedies.  Def. SJ Mem. at 27-28.  AP counters that the ADA and

§ 504 do not include an exhaustion requirement.  Pl. SJ Opp. at 13-15.  This is yet another

argument that District 11 tossed into its opening brief and then, after AP's counsel demonstrated

that the argument was meritless, quickly withdrew.  The Court will nevertheless address the argument briefly.

Neither Title II of the ADA nor § 504 of the Rehabilitation Act includes an exhaustion requirement.  *See O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1061 (9th Cir. 2007); *M.P. v. Indep. Sch. Dist. No. 721*, 439 F.3d 865, 867 (8th Cir. 2006) ("M.P could pursue a Section 504 claim independent of his IDEA claims without exhausting his administrative remedies.").  But claims under those statutes that are closely connected to claims under the IDEA *are* subject to the IDEA's exhaustion requirement.  Section 1415(l) of title 20 of the United States Code provides that the administrative remedies prescribed in the IDEA must be exhausted before a party brings claims under the ADA or the Rehabilitation Act if those claims "seek[] relief that is also available" under the IDEA.  20 U.S.C. § 1415(l).  Courts have accordingly held that the IDEA's exhaustion requirement applies to claims under the ADA and Rehabilitation Act when those claims relate to a school's failure to provide a free appropriate public education.[24]

In this case, however, AP's claims relate to the Adventures Plus day-care program, and not to his education at Peter Enich.  And even if Adventures Plus could be considered the equivalent of kindergarten, the Court would not treat his ADA and § 504 claims as IDEA-type claims because, as explained already, AP's claims relate only tangentially to his education.  Accordingly, AP was not required to exhaust District 11's administrative remedies.

### 3.  Personal Services

---

[24]*See, e.g.*, *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, No. 5:06-CV-139, 2007 U.S. Dist. LEXIS 54660, at *30-33 (July 27, 2007); *S.A.S. v. Hibbing Pub. Schs.*, No. 04-3204 (JRT/RLE), 2005 U.S. Dist. LEXIS 13437, at *6 (D. Minn. July 1, 2005) ("This exhaustion requirement [under the IDEA] also applies if the parent chooses to bring an IDEA type claim under another statute, such as the ADA or Section 504, or the Constitution.").

Section 35.135 of title 28 of the Code of Federal Regulations — a regulation promulgated under the ADA — establishes that public entities are not required to provide disabled persons with, among other things, "services of a personal nature including assistance in eating, toileting, or dressing." 28 C.F.R. § 35.135. District 11 argues in its opening brief that a glucagon injection is a "service of a personal nature" that need not be provided under § 35.135. Def. SJ Mem. at 30.

Frankly, the Court has difficulty understanding the purpose and reach of § 35.135, as many otherwise reasonable accommodations requested by disabled persons — and routinely provided by school districts and other public entities — could be considered "services of a personal nature." The parties have not cited any cases explaining § 35.135, nor has the Court's research turned up any such cases. In the absence of any authority requiring § 35.135 to be construed broadly, the Court will not construe it to cover AP's request that Adventures Plus staff be trained and authorized to provide a glucagon injection in the event of an emergency. The Court further notes that District 11 conceded at oral argument that it was not seriously pressing this defense and candidly admitted that it, like the Court, was puzzled about the meaning of § 35.135.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT District 11's motion for summary judgment [Docket No. 35] is GRANTED IN PART and DENIED IN PART as follows:

1.      To the extent that plaintiff AP's claims for compensatory damages are based on

        District 11's refusal to agree to train and authorize the staff of the Adventures

Plus program to provide glucagon injections to AP in the event of a hypoglycemic

emergency, District 11's motion is GRANTED.  Such claims are DISMISSED

WITH PREJUDICE AND ON THE MERITS.

2.    District 11's motion for summary judgment is DENIED in all other respects.

Dated:  March 17, 2008                              s/Patrick J. Schiltz                              
                                                    Patrick J. Schiltz
                                                    United States District Judge